CAFETEROS DE PUERTO RICO, Plaintiff and Appellant, *v.* TREASURER OF PUERTO RICO, Defendant and Appellee.

No. 10749. Argued March 4, 1953.—Decided April 22, 1953.

*Erasto Arjona Siaca* for appellant. *J. B. Fernández Badillo, Acting Secretary of Justice,* and *Manuel J. Medina Aymat, Assistant Attorney General,* for appellee.

MR. JUSTICE ORTIZ delivered the opinion of the Court.

In order to protect and secure the welfare of the coffee industry of Puerto Rico, the Legislative Assembly approved Act No. 116 of May 15, 1936, (Sess. Laws, p. 678) § 3 of which provided as follows:

"The Treasurer of Puerto Rico is hereby authorized and directed, beginning with the 1936–1937 crop and in successive years, to levy a special tax of one-fourth of a cent on each pound of raw coffee sold in Puerto Rico; *Provided,* That this tax shall be collected only once every year, at the moment the first sale is made, it being understood that 'first sale' means that which is made by the agriculturist to any coffee merchant, dealer, handler, cooperative association, roaster, or any other natural or artificial person, the purchaser being obliged to pay the said tax to the Treasurer of Puerto Rico in such manner as the latter may prescribe in regulations for that purpose. The tax levied hereunder shall be considered as a preferential lien upon any real or personal property of the coffee purchaser. The Treasurer of Puerto Rico is further empowered to prescribe such rules and regulations as may be necessary for the collection of said tax and of administrative fines, and said rules and regulations shall have the force of law."

With the proceeds of such special tax, which, as noted, was payable by the purchasers of coffee when the first sale was made, a special fund was established to carry out an advertising campaign in behalf of our coffee in the United States and Europe.

The plaintiff and appellant is a cooperative association of coffee farmers and growers engaged in receiving, as a deposit, the coffee produced by its members, processing it partially by roasting and hulling the coffee beans, and selling the coffee to purchasers, delivering the selling price to the growers after deducting the proper expenses. Although the appellant was an agent of the growers who sold the coffee, and not of the purchasers, after the approval of Act No. 116 above mentioned, when the appellant sold the coffee to the purchasers it included in the selling price the amount of the tax and withheld such amount in order to deliver it later to the Treasurer of Puerto Rico.

Act No. 145 was approved on May 11, 1939. Sections 3 and 4 thereof provided as follows:

"The Treasurer of Puerto Rico is hereby authorized and directed to levy and collect, from and after the 1939–40 crop, and in succeeding years, a special tax of one and one-half (1½) cents on each pound of raw coffee sold for consumption in Puerto Rico; Provided, That such tax may be collected once only each year at the moment of making the first sale, and by 'first sale' shall be understood the sale made by the coffee grower to any merchant, dealer, handler, cooperative association, coffee roaster, or any other natural or artificial person; Provided, That the minimum price which the Commissioner of Agriculture and Commerce shall fix pursuant to the provisions of Act No. 255 of 1938, shall be increased by the amount of the tax hereinabove levied; And provided, further, That the purchaser shall be subject to the payment of such tax to the Treasurer of Puerto Rico in the manner prescribed by the Treasurer in the regulations he shall promulgate for the purpose. The tax hereinabove levied shall be considered as a preferred lien on any personal or real property owned by the purchaser of the coffee. The Treasurer of Puerto Rico is hereby further empowered to prescribe such

rules and regulations, including administrative fines, as may be necessary for the collection of said tax and such rules and regulations shall have the force of law.

"Section 4.—Out of the proceeds of the special tax so collected and of any amount received by reason of fines imposed for violations of this Act, the Treasurer of Puerto Rico shall set aside eighty (80) per cent to be paid to the Puerto Rican Coffee Corporation, a domestic corporation for nonpecuniary purposes chartered under the provisions of Act No. 17, approved April 13, 1936, and this sum shall constitute a part of the working capital of the said corporation."

The special tax was increased to one and one-half cents per pound of raw coffee, that is, a difference of one and one-fourth cents over the former tax, but the tax was still payable by the purchaser and the new tax was levied "from and after the 1939–40 crop,[1] and in succeeding years."

After the approval of Act No. 145 of 1939, the appellant had on hand 2,898,082 pounds of raw coffee from the 1938–39 crop. There was some doubt as to whether the tax increase established by Act No. 145 of 1939, was applicable exclusively to the coffee produced in the crops of 1939–40 and succeeding years or whether it was also applicable to the coffee sold after the effectiveness of Act No. 145, although produced prior to the 1939–40 crop. In other words, there was doubt as to whether Act No. 145 was applicable to the coffee in possession of the appellant, which had been produced in the 1938–39 crop but which had not been sold prior to the effectiveness of Act No. 145. At this point, the Treasury Department issued and published a circular letter on August 21, 1939, indicating that, in the opinion of the Department, Act No. 145 was applicable only to the coffee produced in the crops of 1939–40 and succeeding years, and that the coffee of the 1938–39 crop would pay only a tax of one-fourth of a cent per pound, pursuant to Act No. 116 of 1936. On November 17, 1939, and on February 27, 1940, the appellant sold

---

[1] The crops begin in the last months of a year and end in the first months of the following year.

the coffee of the 1938–39 crop deducting and withholding from the selling price the amount of the tax of one-fourth of a cent per pound, which it paid to the Treasurer. Subsequently, as hereinafter noted, that is, on May 19, 1942, the Treasurer of Puerto Rico required the appellant to pay an additional tax on the sale of that same coffee, amounting to $37,314.93, equivalent to the difference between one and one-fourth cents per pound and one-fourth of a cent per pound, on the ground that Act No. 145 of 1939 was applicable to the coffee produced in the 1938–39 crop and sold after the effectiveness of Act No. 145 since, according to the Treasurer, the tax was on sales made after the 1938–39 crop and not on production. This requirement has given rise to this suit.

Act No. 157 of 1940 was approved on May 8 of that year. Section 3 thereof provided as follows:

"The Treasurer of Puerto Rico is hereby authorized and directed to levy and collect for a period of ten (10) years, a special tax of one and one-half (1½) cents on each pound of raw coffee sold in Puerto Rico, whether for consumption in the island or for export; *Provided,* That this tax may be collected once only each year at the moment the first sale is made, and by 'first sale' shall be understood the sale made by the grower to any merchant dealer, handler, coffee roaster, cooperative association, or any other natural or artificial person: whether said sale is made for local consumption or for export; and in the case of the exportation or the roasting of the coffee by the grower, said exportation or roasting shall likewise be considered as the first sale for the purposes of this Act; *Provided, further,* That any merchant, dealer, handler, cooperative association, coffee roaster, or any other natural or artificial person buying directly from the grower, and the grower who exports or roasts the coffee shall be subject to the payment of the said tax to the Treasurer of Puerto Rico in the manner prescribed by the Treasurer in the regulations he shall promulgate for the purpose, together with the rules that may be necessary for the collection of said tax, including the imposing of administrative fines; and these rules and regulations shall have the force of law. The tax levied in this Act shall be considered as a preferred lien on any real or personal property owned by the pur-

chaser or grower who exports or roasts the coffee and who is subject hereunder to the payment of the said tax; *Provided, further,* That all coffee in Puerto Rico when this Act takes effect, whether for local consumption or for export, shall be subject to the payment of this tax if it has not previously been paid thereon, and every merchant, dealer, handler, cooperative association, coffee roaster, or any other natural or artificial person who possess said coffee shall be obligated to pay said tax to the Treasurer of Puerto Rico, even though it has already been the object of sale; *And provided, further,* That it shall be the duty of the holders of said coffee in stock in Puerto Rico at the time this Act takes effect, to declare under oath such stock within a period of ten (10) days, on a special blank form which the Commissioner of Agriculture and Commerce of Puerto Rico shall furnish, and all the coffee which is not declared in accordance with the provisions hereof shall be forfeited by the Commissioner of Agriculture and Commerce after such violation is verified, and said coffee so forfeited shall be devoted to exportation, and the proceeds from the sale thereof shall be covered into the 'Fund for the Development of a Market for Puerto Rican Coffee,' created by Section 5 of this Act. In case that any coffee not declared in accordance with the provisions hereof, is sold after this provision takes effect, the Commissioner of Agriculture and Commerce shall impose on the natural or artificial person making such sale an administrative fine equivalent to the proceeds from said sale, which shall be covered into the aforesaid Fund for the Development of a Market for Puerto Rican Coffee."

Under the aforesaid Act, the tax applied to sales of coffee, not only for consumption in Puerto Rico, but also for exportation, and was applicable to all the coffee in stock when the Act took effect, which tax was to be paid by the persons or entities possessing the coffee.[2]

As already noted, on May 19, 1942, the Treasurer demanded appellant to pay the amount of $37,314.93 for taxes, equivalent to the difference between one and one-fourth cents per pound of coffee, and one-fourth of a cent already paid by the appellant, with regard to the coffee produced in the

---

[2] The three Acts above cited were subsequently repealed by Act No. 17 of November 27, 1942 (Spec. Sess. Laws, p. 72).

1938–39 crop. The appellant then filed a complaint which was finally removed to the San Juan Section of the District Court of Puerto Rico. The points in controversy were finally formulated on the basis of an amended complaint, which alleged in substance the foregoing facts; it is indicated that the plaintiff was not a purchaser of coffee, but a mere depository, Acts Nos. 116 of 1936, 145 of 1939 and 157 of 1940 not being applicable thereto, but that the Treasurer believes otherwise and that there is an "imminent danger and threat that the property of the petitioner be attached by the defendant and sold at public auction to collect the alleged tax . . . . That since the plaintiff is not a taxpayer in connection with the attempted collection by the Treasurer, defendant herein, it has been and is unable to avail itself of the remedy of paying under protest established by Act No. 8 of 1927, amended by Act No. 17 of 1941 (Spec. Sess. Laws, p. 54), and to exercise any remedy that said or any other applicable statute might offer. That should the defendant carry out his threat, plaintiff's properties will be attached, foreclosed and sold at public auction at its grave risk and to its irreparable injury since it being as it is an institution of a cooperative nature operating, not for profit, but merely for the protection of its members, it would practically be ruined and estopped from continuing to exist. That the complaint (sic) lacks an adequate remedy at law to confront the situation created by the Treasurer's unauthorized attempt against it, outside of its present action praying for the nullity of past and future actions of said defendant."

The prayer of the amended complaint reads:

"To grant this complaint as a whole and especially decreeing:

"That the demand for the payment of $37,314.93 addressed by the Treasurer of Puerto Rico to the plaintiff on May 19, 1942, is illegal, null, void and improper and ordering him to refrain from enforcing it and from instituting distraint, attachment and foreclosure proceedings against plaintiff's properties to obtain collection thereof.

"That the plaintiff is not bound to pay the amount of

$37,314.93 nor any other lower or higher amount, for the reason indicated in the demand made by the defendant to the plaintiff dated May 19, 1942, nor for any reason in connection with the raw coffee of the growers, members of the Plaintiff Cooperative, corresponding to the crops prior to 1939.

"That the Treasurer of Puerto Rico, defendant herein, is definitively estopped from maintaining or renewing the demand for the payment of the above-mentioned amount by the plaintiff and from instituting administrative fiscal proceedings against the properties of the latter, for the alleged purposes of collecting the nonexistent tax involved herein.

"Any other pronouncement compatible with equity and justice that may be proper in accordance with the facts of this case."

The case was heard on its merits and finally the court *a quo* entered judgment dismissing the complaint. It found as follows:

"The determination of the Treasurer of Puerto Rico did not consist in collecting the taxes on the 2,898,082 pounds of raw coffee in stock under the provisions of Act No. 157 of 1940. It is clearly apparent from the pleadings, both of the Treasurer and of the plaintiff itself, as well as from the tax statement sent by the Treasurer to the plaintiff in collection of the tax debt, that the Treasurer's determination was in the sense that the plaintiff had on hand the aforesaid stock of coffee when Act No. 145 of 1939 took effect, and that when Act No. 157 of 1940 took effect, it only had 72,443 pounds of coffee. This is also disclosed by the letter sent by the Treasurer to the plaintiff on August 19, 1942, a copy of which the plaintiff itself attached to its motion for summary judgment.

"The plaintiff had on hand the 2,898,082 pounds of coffee under the effectiveness of Act No. 145 of 1939. Its motion for summary judgment was specifically based on this fact, alleged by it and proved to the satisfaction of this Court. See the affidavit of its General Manager. Indeed, there is no conflict in the pleadings or in the evidence as to this fact for, as previously pointed out, the Treasurer's determination was to collect the tax on said coffee supply on the basis of Act No. 145 of 1939, and not of Act No. 157 of 1940."

Based on these findings of fact the court decided that under Act No. 145 of 1939 the plaintiff was a taxpayer bound

to pay the special tax fixed by said Act No. 145 and that, since the remedy sought was one in equity, especially of injunction, it had an adequate remedy at law, to wit, to pay under protest and litigate her allegations before the Tax Court, since it could not avail itself of a remedy in equity.

■ The plaintiff appealed to this Court and assigned several errors. This case should be decided on the basis of a preliminary point of law without it being necessary for us to consider the intrinsic merits of the question regarding the applicability of Act No. 145 of 1939 to the 1938–39 coffee crop. The amended complaint is susceptible of a dual interpretation as to its objective and scope. It is susceptible of being construed as a petition for a declaratory judgment together with a petition for a prohibitory injunction. Under either viewpoint, a remedy in equity is prayed for. Here applies the general rule to the effect that, in tax matters, a remedy in equity, especially the remedy of injunction, does not lie if the alleged taxpayer has an adequate remedy in the ordinary course of the law, such as here, the payment of the tax followed by a claim for refund formulated in the former Tax Court. Precisely the same questions involved herein, in substance, were raised before this Court in *Cooperativa Cosecheros de Café* v. *Treasurer*, 69 P.R.R. 210,[3] a mate of the instant case. The following was held:

"The action instituted by the plaintiff may be considered as one for a declaratory judgment, pursuant to the provisions of the Uniform Declaratory Judgment Act, or as a regular suit for injunction to restrain the Treasurer from collecting the tax.

---

[3] There were in Ponce, coetaneously, two analogous cooperative entities engaged in the same operations and having the same purpose, one, the plaintiff in the case at bar and the other, the *Cooperativa de Cosecheros de Café*. In both cases the coffee sold came from crops previous to the 1939–40 crop. The same allegations and arguments were raised in both cases. Even assuming that in *Cooperativa Cosecheros de Café* v. *Treasurer*, *supra*, the coffee was sold after the effectiveness of Act No. 157 of 1940, and not before, as happens in the case at bar, the *ratio decidendi* of the case cited is applicable hereto, since in that case a ruling was established even on the basis that the plaintiff were not a taxpayer.

Neither of those actions is proper. For either of them to lie it would be necessary that the plaintiff should have the status of a taxpayer in respect of the tax sought to be collected; and, further, that the plaintiff should have no other adequate legal remedy for the protection of its right. The plaintiff alleges that it is not bound to pay the tax because such an obligation falls on the purchasers of the coffee. In accordance with the law, the taxpayer is, in the first place, the purchaser of the coffee, that is, one who acquires it directly from the farmer; or, in the second place, the farmer in case he himself exports or processes the coffee; or, in the third place, any natural or artificial person who, at the time the Act went into effect, kept on hand coffee on which no tax had been previously paid.

"If we asume that the plaintiff has the status of a taxpayer, the action for a declaratory judgment does not lie, in accordance with the decision of this Court in *Power Electric Co.* v. *Buscaglia, Treas.,* 63 P.R.R. 945. In said case we held that the remedy provided by law in the Tax Court was adequate and that 'taxpayer should not ordinarily be permitted to by-pass that court by utilizing the device of petitioning for a declaratory judgment in the district court.'

"If we admit that, as alleged in the complaint, the plaintiff cooperative does not have the status of a taxpayer, since it was not the purchaser of the coffee, the remedy of injunction would lie if the complaint contained the necessary allegations to justify the application of that extraordinary remedy. In *Fernández* v. *Buscaglia, Treas.,* 60 P.R.R. 582, we held, to quote from the syllabus, that 'it is not sufficient merely to state in the petition the conclusion that the enforcement of the tax will result in irreparable injury. Specific facts must be alleged from which the court can reasonably find that irreparable damages can be prevented only by injunctive relief.' The complaint in this case does not comply with those requirements. The allegation that the Treasurer threatens to effect the collection of the tax through an attachment proceeding, is not in itself sufficient to make out a case of irreparable injury. We so held in *Fernández* v. *Buscaglia, supra.*

"*The judgment appealed from should be affirmed.*"

We have re-examined the questions decided in the case above cited and we have reached the conclusion that the doctrine laid down therein should be ratified and applied hereto.

*Fernández* v. *Buscaglia, Treas., supra,* was decided under § 678 of the Code of Civil Procedure, as the same read when that case was decided. We stated as follows at pp. 583–4:

"We are concerned here solely with the refusal of the lower court to grant a preliminary injunction. Section 678, Code of Civil Procedure, 1933 ed., provides that 'An injunction cannot be granted: . . 7. To prevent the levying or collection of any tax levied by the laws of the United States or of Puerto Rico.'

"In view of this statute, we have carefully restricted injunctive relief to those cases in which it clearly appears not only that the tax is unlawful, but also that either (*a*) the taxpayer does not have an adequate remedy at law, *or* (*b*) the tax would cause him irreparable injury, *or* (*c*) would give rise to a multiplicity of suits. . . . . ."

Subsequent to the above-cited case our Legislative Assembly endowed the views embodied in *Fernández* v. *Buscaglia, supra,* with more vigor and strength upon approving Acts Nos. 1 and 2 of February 25, 1946. Both Acts prescribed that injunction does not lie to restrain the performance by a public officer of any act authorized by law, unless it had been determined by final, firm, unappealable and unreviewable judgment, that such act is unconstitutional and invalid; that any injunction issued under those circumstances, in force on the date Act No. 1 took effect, was or shall be null and ineffective; that the action known in equity as taxpayer's suit is prohibited; that no court of Puerto Rico shall have jurisdiction to take cognizance, or if an action has been already instituted, continue to take cognizance, either in first instance or on appeal, of any action or proceeding brought by a taxpayer in which the validity or constitutionality of any Act of Puerto Rico or any act of a public official authorized by law is challenged, and that the actions established under the Declaratory Judgments Act shall not be in conflict with the provisions of Act No. 2 above cited and that no writs of injunction or restraining orders shall be issued in violation of the provisions of Act No. 2 in any proceeding for declaratory judgment.

The complaint in the instant case was filed prior to the approval of Acts Nos. 1 and 2 above cited, but judgment was rendered by the court *a quo* after said Acts went into effect. Regardless of any question in connection with the applicability and scope of those two Acts (*Cf. Las Monjas Racing Corp. v. Racing Commission*, 67 P.R.R. 42; *Suárez v. Tugwell, Governor*, 67 P.R.R. 166; *Mari v. Vicéns*, 67 P.R.R. 442; *Jiménez v. Jiménez*, 71 P.R.R. 469), said Acts unquestionably ratify and support the former opinion of this Court, on statutory bases, to the effect that neither an injunction nor a declaratory judgment lies as to the payment of taxes if the plaintiff has an adequate remedy at law regarding the payment or refund of taxes. *Fernández v. Buscaglia, Treas. supra; Power Electric Co. v. Buscaglia, Treas, supra.* That opinion has been recently ratified by this Court in *Descartes, Treas. v. Tax Court and Trigo Hnos.*, 73 P.R.R. 282.

The rule we have enunciated (pay first, litigate afterwards) is solidly based on a general policy inspired in the protection of social interests of greater validity and significance than the transitory individual interest to avoid the immediate payment of a tax. The Government should not be obstructed in the exercise of its functions. The doctrine prohibiting injunctions when there is an adequate remedy at law is based on the desire to avoid the paralization of governmental activities in harmony with the protection of the legitimate interests of taxpayers in granting the latter a reasonable opportunity to enforce their rights by means of the ordinary remedy at law available to them.

As the United States Supreme Court indicated in *Great Lakes Co. v. Huffman*, 319 U. S. 293, 87 L. ed. 1407, the same considerations determining that injunction does not lie in these conditions, are likewise valid to prohibit an action for a declaratory judgment regarding a controversy as to the obligation to pay taxes, since, substantially, an action for a declaratory judgment partakes of the nature of a remedy in equity, and preferred consideration thereof, before paying

the tax, may also obstruct the normal course of governmental activities.   (To the same effect see *Descartes, Treas.* v. *Tax Court and Trigo Hnos., supra,* and the recent case of *Goodyear Tire & Rubber Co.* v. *Tierney,* 1952, 104 N. E. 2d 222.)

But the appellant argues that the rule restraining the issuance of injunctions and declaratory judgments in tax cases when there is an adequate remedy at law is not applicable to a situation like the one involved here in which the appellant alleges that it is not a taxpayer at all and that Acts Nos. 116 of 1936 and 145 of 1939 are not applicable to it since they levy the tax on coffee purchasers, and appellant is not a purchaser but a cooperative of farmers-sellers serving exclusively as an agent of the sellers and not of the purchasers.   However, even if the appellant may have a reasonable basis to contend that it is not a taxpayer subject to the provisions of the law, the considerations of public policy we have set forth determine that said allegation of the appellant must be elucidated in an ordinary proceeding concerning the payment of taxes and not in the proceeding chosen by the appellant.   Anyhow, every claim that a tax is illegal involves the allegation that, as to a certain amount or as to certain items, at least, the petitioner is not a taxpayer.   Every allegation of exemption, for example, involves the contention that a certain Act is not applicable to a plaintiff.   *Cf.* Annotation in 84 A.L.R. 1315, 1326: *Injunctions to Enforce Exemptions.*   From the viewpoint of equity, it might be argued that it would be unfair and oppressive to oblige a person, clearly not a taxpayer, to pay a tax he does not owe and which is altogether void, and then to compel him to bring an action for refund.   But we cannot forget that many juridical doctrines are the result of weighing and examining different individual and public interests and needs.   The interest to avoid an immediate individual inconvenience should be subordinate, in these conditions, to the social interest, of a greater significance, of avoiding the paralization of governmental activities.   We have spoken of an immediate and not

permanent individual inconvenience, inasmuch as the doctrine under discussion presumes the existence of an adequate remedy at law in which the allegations of the petitioner will be finally elucidated. It must then be determined who shall suffer the immediate impact, either the citizen in paying the tax and finding himself compelled to wait a certain period of time for the refund thereof, or the Government in not receiving the payment of the tax and finding itself compelled to wait in order to obtain such fiscal resources necessary for its operation. This dilemma has been settled by imposing on the taxpayer the immediate burden of the delay as to the final decision of the matter.

Furthermore, it is not quite clear that the appellant is not a taxpayer. Its status is not depicted with absolute clearness.[4] On the one hand, Acts Nos. 116 of 1936 and 145 of 1939 prescribed that the tax would be levied on the first sale of coffee, the purchaser being subject to the payment of the tax. The appellant, in its organization and in its current operations, was an agent of the sellers, not a purchaser. On the other hand, as a matter of fact, after Act No. 116 of 1936 took effect, the appellant paid the tax itself after deducting it from the selling price. Moreover, the uncontroverted evidence presented by the appellant itself demonstrated that when the growers delivered the coffee to the appellant, the latter advanced to the former substantial part of the selling price, on the basis of loans prearranged by the appellant. We should also notice that on September 18, 1939, the Treasurer of Puerto Rico promulgated Regulation No. 34 to "collect the tax of one and one half (1½) cents per pound of raw coffee sold for consumption in Puerto Rico," and the word "purchaser" was defined in that Regulation as follows:

---

[4] Of course, the question whether the plaintiff was a taxpayer or not, in order to determine if a remedy in equity lies, is different from the question of whether the tax may be increased as to coffee crops prior to the 1939–40 crop.

"Purchaser shall mean any person or dealer, handler, cooperative association who by himself, or by means of his agent or employees purchases, exchanges or acquires by means of any other kind of contract, raw coffee directly from the grower."

Such definition applies to the appellant. It is true that a regulation may be void and *ultra vires* if its provisions are contrary to or not authorized by law. The Acts above cited do not define the term "purchaser" exactly and prescribe that the purchaser shall be subject to the payment of the tax in such manner as the Treasurer may "prescribe in regulations for that purpose." At any rate, it suffices to say that the question regarding the status of the appellant is debatable, which emphasizes even more the applicability hereto of the doctrine to the effect that neither an injunction nor a declaratory judgment lies when the plaintiff has an adequate remedy in the ordinary course of the law.

The appellant alleges that the remedy of paying the tax first and claiming for refund later is not adequate in its case since it would suffer irreparable injury in view of the fact that it is a cooperative association obtaining neither benefit nor profit, being a mere intermediary of the growers and that, therefore, it has no available funds to pay the tax and that, consequently, the Treasurer would have to attach, foreclose and sell at public auction the properties of the appellant. Of course, a remedy at law is not adequate if it entails or does not prevent irreparable injury. It has been held that injunction does not lie to restrain collection of a tax unless there are especially extraordinary circumstances rendering such coercive relief necessary. *Paul Smith Const. Co.* v. *Buscaglia*, 140 F. 2d 900.[5] The existence of such extraordinary circumstances has not been proved here.

---

[5] It might be argued that even that exception as especially extraordinary circumstances is equivalent to judicial legislation, since the statutes prohibiting injunctions in cases of tax collection do not specifically contain that exception. See 49 Harv. L. Rev. 109: *"Enjoining the Collection of Federal Taxes Despite Statutory Prohibition."*

The same allegation made by the appellant herein was overruled by this Court in *Cooperativa Cosecheros de Café* v. *Treasurer, supra,* in deciding that the allegation that the Treasurer threatens to effect the collection of the tax through distraint proceedings is not in itseif sufficient to make out a case of irreparable injury. See also *Fernández* v. *Buscaglia, Treas., supra.* Considering the relations between the appellant and its members, including credit possibilities, it has not been shown that this is a case of insolvency, ruin and disappearance of the appellant if collection of the tax is enforced.

The judgment appealed from will be affirmed.